1  Melissa A. Fortunato (SBN 319767)
     fortunato@bespc.com
2  BRAGAR EAGEL & SQUIRE, P.C.
   445 S. Figueroa Street, Suite 3100
3  Los Angeles, CA 90071
   Telephone: (213) 612-7735
4  Facsimile: (212) 214-0506

5  *Attorney for Plaintiffs*

6  [Additional Counsel on Signature Page]

7             **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
8

9  | SABRINA JEFFRIES, derivatively on behalf of AFFIRM HOLDINGS, INC., | Case No.: |

10

                                     Plaintiff,

11                                              **VERIFIED SHAREHOLDER**
                                                **DERIVATIVE COMPLAINT**
         v.
12                                              **JURY TRIAL DEMANDED**
   MAX LEVCHIN, MICHAEL LINFORD,
13 JEREMY LIEW, LIBOR MICHALEK, JENNY
   J. MING, JEREMY PHILIPS, CHRISTA S.
14 QUARLES, KEITH RABOIS, JACQUELINE
   D. RESES, and JAMES D. WHITE,
15
                                     Defendants,
16           and

17 AFFIRM HOLDINGS, INC.,

18                                   Nominal Defendant.

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiff Sabrina Jeffries ("Plaintiff"), by and through his/her counsel, derivatively on behalf of Nominal Defendant Affirm Holdings, Inc. ("Affirm" or the "Company"), submits this Verified Shareholder Derivative Complaint against Defendants and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his/her counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by Affirm with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Affirm; (iii) Securities Class Action (defined herein) against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between February 12, 2021 and December 15, 2021 (the "Relevant Period") with respect to Affirm's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning Affirm.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action asserted on behalf of Nominal Defendant Affirm against certain officers and the members of the Company's Board.

2. Affirm is a financial technology company that offers "buy now, pay later" ("BNPL") a type of short-term financing. The Company provides loan services to consumers through partnerships with participating merchants.

3. BNPL enables consumers to make purchases and pay for them over time with little to no interest. Compared to traditional credit cards and personal loans, BNPL loans are fairly easy for consumers to get approved for and may not require a credit score inquiry. Unless the consumer fails to pay or makes a late payment, the consumer's credit score will not be affected.

4. The BNPL model provides that BNPL companies, such as Affirm, pay for the purchase, and finance a repayment plan with the consumer. The Company's mobile online platform is designed to allow consumers to receive products before fully purchasing them. As of December

31, 2021, the Company's platform has been successful, reaching over 11 million consumers across 170,000 merchants.

5.      The BNPL method circumvents credit card companies and large lending institutions, such as banks. The loans that BNPL companies extend to consumers are not reported to the credit bureaus or other BNPL companies.

6.      Affirm provides small loans to consumers at the point-of-sale ("POS") of a transaction by quickly evaluating a customer's credit worthiness through a seconds-long credit investigation that does not affect the consumer's credit score. The credit check often includes a customer's Fair Isaac Corporation ("FICO") score, prior purchasing and repayment history, and social media presence.

7.      Because the BNPL model charges little to no interest to consumers. Compared to credit card companies, which charge merchants between a 2% and 4% fee, BNPL companies, including Affirm, generate revenue by charging merchants a fee ranging from 4% to 9.5% of the purchase price.

8.      The competition among the BNPL companies drives the fee down so that the companies remain competitive. When the various fees per transaction are considered, such as an interchange fee, network fee, issuer processers fee, credit costs, and funding, profit margins for BNPL companies and Affirm are rather thin.

9.      Despite the higher costs, merchants continue to employ the BNPL model, citing more sales, new customers, and larger purchases.

10.      Affirm finances many sales in the electronics, home goods, furniture, travel, and home fitness industries.

11.      On December 16, 2021, due to widespread concern regarding the BNPL business model, the Consumer Financial Protection Bureau ("CFPB") ordered Affirm to gather data on the risks and benefits of BNPL, citing concern over accumulating debt, regulatory arbitrage, and data harvesting.

12.     On this news, Affirm's stock price dropped $11.74, or 10.58%, to close at $99.24 on December 16, 2021 .

13.     Throughout the Relevant Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors (i) the Company's business model raised massive consumer debt, regulatory arbitrage, and data harvesting; (ii) as a result, the Company faced an increased risk for regulatory inquiry, investigation, and enforcement; and (iii) the Company failed to maintain internal controls.; and (iv) that, as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

14.     As a direct and proximate result of the misconduct described herein by Individual Defendants (defined herein), Affirm has sustained significant damages as described below.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has jurisdiction over each defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the nominal defendant because it is authorized to do business in this state and has consented to service in this state.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Affirm occurred in this

District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

18.     Plaintiff is a shareholder of Affirm. She was a shareholder during the time of the wrongdoing and has continuously held stock in the Company at all times relevant to the wrongdoing by Defendants alleged herein.

19.     Nominal Defendant Affirm is incorporated under the laws of Delaware, and its principal executive offices are located at 650 California Street, San Francisco, California 94108. Affirm's common stock trades on the NASDAQ Stock Exchange ("NASDAQ") under the symbol "AFRM."

20.     Defendant Max Levchin ("Levchin") has served as a member of the Board since 2012. According to the Company's Schedule 14A Proxy Statement filed with the SEC on October 20, 2021 (the "2021 Proxy Statement"), as of October 1, 2021, Defendant Levchin beneficially owned 27,220,766 shares of the Company's common stock, representing 29.2% of the Company's total outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on October 1, 2021 was $117.85, Defendant Levchin beneficially owned approximately $3.2 billion worth of Affirm stock. For the fiscal year ended June 30, 2021 (the "2021 Fiscal Year"), Defendant Levchin received $451,207,726 in total compensation from the Company. This included $10,000 in salary, $451,052,591 in option awards, and $145,135 in all other compensation.[1]

21.     Defendant Jeremy Liew ("Liew") has served as a member of the Board since 2013. He has served as a member of the Nominating and Governance Committee since at least 2021 and as Chair of the Compensation Committee since at least 2021. According to the 2021 Proxy Statement, as of October 1, 2021, Defendant Liew beneficially owned 9,317,422 shares of the

---

[1] The option award amount, per the 2021 Proxy Statement "Executive Compensation Tables" states that the amounts reported "reflect the accounting cost for these awards and do not correspond to the actual economic value that may be received by the Named Executive Officer upon the sale of any of the underlying share of Class A common stock."

Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 1, 2021 was $117.85, Defendant Liew owned approximately $1.1 billion worth of Affirm stock. For the 2021 Fiscal Year, Defendant Liew received $246,601 in total compensation from the Company. This included $46,583 in fees earned or paid in cash and $200,018 in stock awards.

22.     Defendant Libor Michalek ("Michalek") has been a member of the Company's Board since May 2021. According to the 2021 Proxy Statement, as of October 1, 2021, Defendant Michalek beneficially owned 2,605,925 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 1, 2021 was $117.85, Defendant Michalek beneficially owned approximately $307.1 million worth of Affirm stock. For the 2021 Fiscal Year, Defendant Michalek received $13,591,619 in total compensation from the Company. This included $431,667 in salary, $3,220,073 in stock awards, $9,736,383 in option awards, and $203,496 in all non-equity incentive plan compensation.

23.     Defendant Jenny J. Ming ("Ming") has served as a member of the Board since February 2021 and as a member of the Audit Committee since 2021. For the 2021 Fiscal Year, Defendant Ming received $887,539 in total compensation from the Company. This included $25,625 in fees earned or paid in cash and $861,914 in stock awards.

24.     Defendant Christa S. Quarles ("Quarles") has served as a member of the Board since 2018. She has served as Chair of the Audit Committee since at least 2021. According to the 2021 Proxy Statement, as of October 1, 2021, Defendant Quarles beneficially owned 245,862 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 1, 2021 was $117.85, Defendant Quarles beneficially owned approximately $28,974,836 worth of Affirm stock. For the 2021 Fiscal Year, Defendant Quarles received $252,685 in total compensation from the Company. This included $52,667 in fees earned or paid in cash and $200,018 in stock awards.

25.     Defendant Keith Rabois ("Rabois") has served as a member of the Board since 2013 and as a member of the Audit Committee since at least 2021. According to the 2021 Proxy Statement,

as of October 1, 2021, Defendant Rabois beneficially owned 202,700 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on October 1, 2021 was $117.85, Defendant Rabois owned approximately $253,254,754 million worth of Affirm stock.

26.     Defendant Jacqueline D. Reses ("Reses") has served as a member of the Board since 2021. For the 2021 Fiscal Year, Defendant Reses received $889,623 in total compensation from the Company. This included $27,708 in fees earned or paid in cash and $861,914 in stock awards.

27.     Defendant James D. White ("White") has served as a member of the Board since 2021. For the 2021 Fiscal Year, Defendant White received $888,581 in total compensation from the Company. This included $26,667 in fees earned or paid in cash and $861,914 in stock awards.

28.     Relevant Non-Party Noel Watson ("Watson") has served as a member of the Board since September 2022.

29.     The following Individual Defendants are collectively referenced herein as the "Director Defendants": Levchin, Liew, Michalek, Ming, Quarles, Rabois, Reses, and White.

30.     The following Individual Defendants are collectively referenced herein as the "Officer Defendants": Levchin and Linford.

31.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Ming, Quarles, and Rabois.

32.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Levchin and Linford.

33.     The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

34.     The following chart identifies the Individual Defendants, their associated references herein, and other relevant information discussed in more detail below:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Individual Defendants | Director Defendants | Officer Defendants | Audit Committee Defendants | Securities Class Action Defendants |
|---|---|---|---|---|
| Levchin | X<br>2012 - present | X | | X |
| Liew | X<br>2013 - present | | | |
| Linford | | X | | X |
| Michalek | X<br>2021 - present | | | |
| Ming | X<br>2021 – present | | X<br>2021 - present | |
| Quarles | X<br>2018 - present | | X<br>Chair<br>2021 - present | |
| Rabois | X<br>2013 - present | | X<br>2021 - present | |
| Reses | X<br>2021-– present | | | |
| White | X<br>2021 - present | | | |

## BACKGROUND

35.     Affirm provides consumers with the ability to purchase items upfront, without full payment, based on a BNPL model, whereby consumers receive the item they want and pay for it in monthly installments.

36.     Affirm offers POS loans to consumers who may not qualify for credit cards due to having a poor credit score.

37.     Affirm offers consumers 0% to 30% Annual Percentage Rate ("APR") interest rates. The Company weighs the customer's credit score, credit history, state of the economy, and agreement with the merchant store to determine the interest rate for the purchase.

38.     Affirm's main form of revenue comes from charging merchants a fee between 4% and 10% of the purchase price.

39.     Affirm's BNPL method, particularly its interest-free monthly installment payment plan, purportedly enables consumers to make more frequent purchases and more expensive, larger purchases.

40.     As a result of the COVID-19 pandemic, Affirm's business skyrocketed, and between 2020 and 2021, the Company grew its revenue by 59% year-over-year from 2020 to 2021.

41.     In the Company's Merchant network revenue section, Affirm's revenue grew 68% year-over-year from 2020 to 2021, and in the Virtual card network revenue section, revenue grew 38% year-over-year from 2020 to 2021.

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS SHAREHOLDERS

42.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its shareholders, the members of the public who had invested in Affirm.

43.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

44.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

45.     Each of the Company's directors owes to the Company and its shareholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

46.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

47.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the

Company. By virtue of such duties, the officers, and directors of Affirm were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

48.     The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its shareholders despite their knowledge of the risk of serious injury to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

49.     Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Affirm.

**DIRECTOR DEFENDANTS ON THE**
**AUDIT COMMITTEE OWE ADDITIONAL DUTIES**

50.     The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Ming, Quarles, and Rabois during the Relevant Period.

51.     Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the following:

- Review and discuss with the Independent Auditor its annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year;

- Review with management, the Independent Auditor and the leader of the Corporation's intern audit function, the following: (i) all critical accounting policies and practices used; (ii) any critical audit matters arising from the current period audit; (iii) all alternative treatments of financial information that the Independent Auditor has discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor; (iv) all other material written communications between the Independent Auditor and management, such as any management letter and any schedule of unadjusted differences; and (v) any material financial arrangements of the Corporation which do not appear on the financial statements of the Corporation;

- Resolve all disagreements between the Independent Auditor and management regarding financial reporting.

- Review the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Corporation's internal audit function, through inquiry and discussions with the Independent Auditor, management and the leader of the Corporation's internal audit function; and if applicable, the yearly report prepared by management, and attested to by the Independent Auditor, assessing the effectiveness of the Corporation's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over the financial reporting prior to its inclusion in the Corporation's Annual Report on Form 10-K;

- Review periodically with the Chief Executive Officer, Chief Financial Officer and the Independent Auditor: (i) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize, and report financial information; (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal control over financial reporting;

- Discuss guidelines and policies governing the process by which senior management of the Corporation and the relevant departments of the Corporation, including the internal audit function, assess and manage the Corporation's exposure to risk, as well as the Corporation's major litigation and financial risk exposures and the steps management has taken to monitor and control such exposures it being understood that it is the job of management to assess and manage the Corporation's exposure to risk and that

the Committee's responsibility is to discuss guidelines and policies by which risk assessment is undertaken;

- Provide input to management regarding the selection, review and removal of the leader of the Corporation's internal audit function;

- Review with management the progress and results of all internal audit projects, and, when deemed necessary or appropriate by the Committee, assign additional internal audit projects to the leader of the Corporation's internal audit function;

- Review and discuss with the Independent Auditor the results of the year-end audit of the Corporation, including any comments or recommendations of the Independent Auditor, and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Corporation's financial statements should be included in the Annual Report on Form 10-K; and

- Review the type and presentation of information to be included in the Corporation's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Corporation to analysts and ratings agencies (which review may be done generally (e.g., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Corporation may provide earnings guidance).

- Prepare the audit committee report required by Item 407(d) of Regulation S-K to be included in the Corporation's annual proxy statement;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Review and approve in advance any services provided by the Independent Auditor to the Corporation's executive officers or members of their immediate family;

- Review the Corporation's program to monitor compliance with the Corporation's Code of Conduct and meet periodically with the Corporation's Chief Legal Officer to discuss compliance with the Code of Conduct;

## DEFENDANTS BREACH THEIR DUTIES
## TO THE COMPANY AND ITS SHAREHOLDERS

52. Through a series of communications, Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors (i) the Company's BNPL business model raised massive consumer debt, regulatory arbitrage, and data harvesting; (ii) as a result, the Company faced an increased risk for regulatory inquiry, investigation, and enforcement; and (iii) the Company failed to maintain internal controls; and (iv) that, as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

53. On February 11, 2021, the Company issued a press release announcing its second quarter 2021 financial results ended December 2020. Therein, Defendant Levchin is quoted stating as follows, in relevant part:

> Since we founded Affirm and through to this day, our mission has been to build **honest financial products** that improve lives. We've aligned our success with the success of both sides of the commerce ecosystem, winning when our consumers and our merchants win . . . As we look ahead, we remain committed to empowering consumers to take control of their finances, helping merchants grow their revenue on our platform, and developing new innovative solutions to establish the ubiquity of our network and breath of our platform.

(Emphasis added.)

54. On February 17, 2021, the Company filed its second quarter 2021 results on Form 10Q with the SEC ("2Q2021"). In its 2Q2021, the Company stated that it "provides consumers with

a simpler, more transparent, and flexible alternative to traditional payment options," and that the Company's "mission is to deliver ***honest financial products*** that improve lives."

55.    The 2Q2021 also stated as follows:

> Affirm enables consumers to confidently pay for a purchase over time ... . Consumers get the flexibility to buy now and make simple monthly payments for their purchases and merchants see . . . an overall more satisfied customer base. Unlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties.

56.    The 2Q2021 stated as follows regarding the Company's failure to comply with law and regulatory requirements.

> While we have developed policies and procedures designed to assist in compliance with these laws and regulations, no assurance is given that our compliance policies and procedures will be effective. Failure to comply with these laws and with regulatory requirements applicable to our business could subject us to damages, revocation of licenses, class action lawsuits, administrative enforcement actions, and civil and criminal liability, which may harm our business.

57.    Defendants Levchin and Linford attested to the accuracy of the certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attached to the 2Q2021.

58.    On May 10, 2021, the Company issued a press release announcing its third quarter financial results ended March 31, 2021. Therein, Defendant Levchin is quoted as stating that "Affirm's strong third quarter results reflect continued progress toward building the most valuable and transparent financial network for consumers and merchants."

59.    In the same press release, Defendant Levchin stated, "[d]uring the period, we more than doubled the number of merchants on our platform, accelerated GMV growth to 83%, and increased active consumers by 60% year-over-year." He continued touting the Company's momentum, stating as follows:

> We are seeing strong momentum in our business as we advance our growth strategy. In recent weeks, we have activated Shop Pay Installments powered by Affirm for more than 10,000 Shopify merchants. We expect this number to significantly increase as we move towards general availability in June. Looking ahead, we believe the strengthening health of the consumer, Affirm's deep and diverse merchant

partnerships, and our unrivaled technology will position us to capture a substantial share of our expanding market opportunities. We are just getting started and we look forward to demonstrating the full power of Affirm as the economy continues to reopen.

60. On May 17, 2021, the Company filed a 10-Q with the SEC detailing the Company's financial results for the third quarter ended March 31, 2021 ("3Q2021"). Therein, the Company restated as set forth in ¶¶53-54, *supra*, that the Company "provides consumers with a simpler, more transparent, and flexible alternative to traditional payment options. Our mission is to deliver ***honest financial products*** that improve lives."

61. Defendants Levchin and Linford attested to the accuracy of these statements in signed Sarbanes-Oxley ("SOX") certifications.

62. On September 9, 2021, the Company issued a press release announcing its fourth quarter and fiscal year ended June 30, 2021 results. In relevant part, the press release stated as follows:

> "Affirm's strong results this quarter and fiscal year demonstrate the progress we are making in rapidly expanding our network," said Max Levchin, Founder and Chief Executive Officer of Affirm. "More consumers and merchants are continuing to choose Affirm because of our ability to offer a variety of ways to pay, thanks to our unrivaled technology. During the fourth quarter, we increased the number of merchants on our platform by more than fivefold, more than doubled gross merchandise volume and grew active consumers by 97% year over year." Levchin continued, "The secular shift toward flexible and transparent financial products continues to accelerate. With our superior technology, Affirm is strongly positioned to build a more valuable two-sided network for consumers and merchants. We remain focused on extending our leadership position with our core products, while capitalizing on our vast opportunities to empower more people with the new ones we continue to launch."

63. On September 17, 2021, the Company filed its 2021 annual report on Form 10-K with the SEC ("10K2021"). Therein, the Company stated that Affirm is "transparent and honest—with our consumers and with each other. That is why there are no hidden fees or tricks associated with the loans facilitated through our platform."

64. Regarding the evaluation of the Company's disclosure controls and procedures, the 10K2021 stated as follows:

> Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer has evaluated the effectiveness of our disclosure controls and procedures. . . . Based on this evaluation, our Chief Executive Officer and our Chief

Financial Officer concluded that disclosure controls and procedures were effective as of June 30, 2021.

65.     Defendants Levchin and Linford attested to the accuracy of the 10K2021 in SOX certifications.

66.     On October 20, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Levchin, Liew, Linford, Michalek, Ming, Quarles, Rabois, Reses, and White solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

67.     The 2021 Proxy Statement called for Company shareholders to vote to, *inter alia*, (1) elect Defendants Michalek and Reses to the Board to hold office until 2024; (2) approve, via non-binding advisory vote, the frequency of future non-binding votes to approve the compensation of the Company's named executive officers, including Defendants Levchin and Michalek; and (3) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2022.

68.     With respect to the Company's Code of Conduct, the 2021 Proxy Statement stated that "[o]ur Board has adopted Corporate Governance Guidelines [and] has adopted a Code of Ethics and Business Conduct that applies to all of our employees, officers, and directors, including our chief executive officer, chief financial officer, and other executive and senior financial officers."

69.     The 2021 Proxy Statement also discussed the "Role of the Board in Risk Oversight":

> One of the key functions of our Board is informed oversight of our risk management processes which risks include, among others, strategic, financial, business, and operational, cybersecurity, legal and regulatory compliance, and reputational risks. Our Board does not have a standing risk committee, but rather administers this oversight function directly through the Board as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure. Our Audit Committee is responsible for discussing our major litigation and financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies with respect to risk assessment and risk management.

> In addition to oversight of the performance of our external audit function, our Audit Committee also monitors compliance with legal and regulatory requirements. Our Nominating and Governance Committee develops and reviews our Corporate Governance Guidelines and reviews related party transactions. Our Compensation Committee reviews with management our compensation

arrangements  to  evaluate whether any of our compensation policies and programs has the potential to encourage  excessive risk-taking and reviews discussed the relationship between risk management policies and practice, corporate strategy and our compensation arrangements.

70.     Under the heading "Pay-for-Performance" the 2021 Proxy Statement stated as follows:

We believe our executive compensation program is reasonable, competitive, and appropriately balances the goals of attracting, motivating, rewarding, and retaining our Named Executive Officers with the goal of aligning their interests with those of our stockholders. To ensure this alignment and to motivate and reward individual initiative and effort, a substantial portion of our Named Executive Officers' target annual total direct compensation opportunity is both variable in nature and "at-risk."

71.     Regarding the Company's Pay-for-Performance philosophy, the 2021 Proxy Statement stated that the majority of the Company's named executive officers "target annual direct compensation is directly linked to our financial, operational, and strategic results and our stock price performance."

72.     Under Executive Compensation Philosophy and Objectives, the 2021 Proxy Statement stated as follows:

Our executive compensation program is guided by our overarching philosophy of paying for high and demonstrable performance. We strive to compensate our Named Executive Officers in a manner that is competitive, rewards achievement of our business objectives, and aligns the interests of our Named Executive Officers with those of our stockholders. Consistent with this philosophy, we have designed our executive compensation program to achieve the following primary objectives:

- provide market competitive compensation and benefit levels that will attract, motivate, reward and retain our Named Executive Officers within the context of responsible cost management;

- establish a direct link between our financial and operational results and strategic objectives and the compensation of our Named Executive Officers;

- align the interests and objectives of our Named Executive Officers with those of our stockholders by linking their 23 long-term incentive compensation opportunities to stockholder value creation and their cash incentives to our annual performance; and

- offer total compensation opportunities to our Named Executive Officers that, while competitive, are internally consistent and fair.

Generally, we structure the annual compensation of our Named Executive Officers using three principal elements: base salary, short-term cash incentive opportunities, and long-term equity incentive opportunities in the form of equity awards. The design

of our executive compensation program is influenced by a variety of factors, with the primary goals being to align the interests of our Named Executive Officers and stockholders and to link pay with performance.

73.    The 2021 Proxy Statement also granted equity awards of 347,143 in option shares and 168,163 in restricted stock units ("RSUs") to Linford and 443,571 in option shares and 112,653 in RSUs to Michalek.

74.    Defendants Levchin, Liew, Linford, Michalek, Ming, Quarles, Rabois, Reses, and White caused the 2021 Proxy Statement to be false and misleading by failing to disclose that: (1) the Company's business model fostered massive consumer debt, regulatory arbitrage, and data harvesting; (2) as a result, the Company faced an increased risk for regulatory inquiry, investigation, and enforcement; and (3) the Company failed to maintain internal controls. As a result, Affirm's public statements were materially false and misleading at all relevant times.

75.    Defendants Levchin, Liew, Linford, Michalek, Ming, Quarles, Rabois, Reses, and White also caused the 2021 Proxy Statement to be false and misleading by failing to disclose that (1) although the Company claimed its directors and officers adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed and that (2) the Board's and its committees' risk oversight functions were not properly being exercised, as evidenced by the occurrence of the wrongdoing alleged herein.

76.    On November 10, 2021, the Company issued a press release announcing its first quarter 2022 financial results for the period that ended on September 30, 2021. In relevant part, the press release quoted Defendant Levchin as stating the following:

> "Our unrivaled technology, industry-leading talent and the investments we are making are delivering results. Over the last year, we expanded our network by increasing the number of active merchants on our platform to over 100,000 and more than doubling the number of active consumers. These deep connections and our partnerships with merchants drove growth in GMV, frequency of engagement, and revenue."

> Levchin continued, "We are pleased with our performance and proud of the contributions of our nearly 2,000-strong Affirm team. At the same time, there is a lot more for us to build to achieve our objectives, and we are even more excited about the opportunities ahead. We remain focused on continuing to delight and grow both

sides of our network by giving people even more reasons to choose Affirm with more products and in more markets."

77.    Under the heading "Recent Business Highlights," the same press release announced that the Company had tightened its relationship with Amazon:

> Today, the Company announced that it has expanded its relationship with Amazon. Affirm will be generally available to support all eligible purchases of $50 dollars or more on Amazon.com and the Amazon shopping app in the United States. Consumers will have the option to split the total cost of eligible purchases into monthly payments at checkout with no late or hidden fees, ever. As part of the amended agreement, Affirm will serve as Amazon's only third party, non credit card, buy now, pay later ("BNPL") option in the U.S. Until January 2023, Amazon will be subject to certain restrictions on providing other installment products in the U.S. by other BNPL providers. Affirm will also be integrated into Amazon Pay's digital wallet in the U.S. In conjunction with the amended agreement, Amazon will receive multiple tranches of warrants to purchase shares of Affirm's Class A Common Stock, some of which are subject to satisfaction of certain performance obligations and vesting conditions.

78.    In the same press release, Defendant Linford is quoted as follows:

> During the first quarter, we continued to scale our two-sided network, delivering robust top-line growth, strong unit economics and even greater capital efficiency. We are seeing traction across all products and verticals, and deepening our trusted relationships with merchants and consumers alike. As we continue to capitalize on our hyper growth phase, we are strongly positioning ourselves for the long-term by investing in our key competitive advantages in technology and talent.

79.    On November 15, 2021, the Company filed its first quarter 2022 financial results on Form 10-Q with the SEC ("1Q2022") Therein, the Company reiterated that Affirm "provides consumers with a simpler, more transparent, and flexible alternative to traditional payment options. Our mission is to deliver ***honest financial products*** that improve lives" as set forth in ¶¶ 53-54, 60, *supra*.

80.    Defendants Levchin and Linford attested to the accuracy of the 1Q2022 in signed SOX certifications.

81.    The statements identified in ¶¶ 53-56, 58-60, 62-64, 68-73, and 76-79 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) the Company's BNPL business model raised massive consumer debt, regulatory arbitrage, and data harvesting; (ii) as a result, the Company faced an increased risk for regulatory inquiry, investigation,

and enforcement; and (iii) the Company failed to maintain internal controls.; and (iv) that, as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

## THE TRUTH IS REVEALED

82.     On December 16, 2021, the CFPB announced an investigation into five companies that utilize the BNPL business model, including Affirm, stating as follows in a press release on that day:

> Today the [CFPB] issued a series of orders to five companies offering "buy now, pay later" (BNPL) credit. The orders to collect information on the risks and benefits of these fast-growing loans went to Affirm. . . . The CFPB is concerned about accumulating debt, regulatory arbitrage, and data harvesting in a consumer credit market already quickly changing with technology.

> "Buy now, pay later is the new version of the old layaway plan, but with modern, faster twists where the consumer gets the product immediately but gets the debt immediately too," said CFPB Director Rohit Chopra. "We have ordered Affirm . . . to submit information so that we can report to the public about industry practices and risks."

> Buy now, pay later credit is a type of deferred payment option that generally allows the consumer to split a purchase into smaller installments, typically four or less, often with a down payment of 25 percent due at checkout. The application process is quick, involving relatively little information from the consumer, and the product often comes with no interest. Lenders have touted BNPL as a safer alternative to credit card debt, along with its ability to serve consumers with scant or subprime credit histories.

> *        *        *

> The law requires that the CFPB monitor consumer financial markets and enables the agency to require market players to submit information to inform this monitoring. The CFPB expects to publish aggregated findings on insights learned from this inquiry. Today's orders seek to illuminate the range of these consumer credit products and their underlying business practices. Specifically, the bureau is concerned about:

> o **Accumulating debt:** Whereas the old-style layaway installment loans were typically used for the occasional big purchase, people can quickly become regular users of BNPL for everyday discretionary buying, especially if they download the easy-to-use apps or install the web browser plugins. If a consumer has multiple purchases on multiple schedules with multiple companies, it may be hard to keep track of when payments are scheduled. And when there is not enough money in a consumer's bank account, this can potentially result in charges by both the consumer's bank and the BNPL provider. Because of the ease of getting these loans, consumers can end up spending more than anticipated.

- o **Regulatory arbitrage**: Some BNPL companies may not be adequately evaluating what consumer protection laws apply to their products. For example, some BNPL products do not provide certain disclosures, which could be required by some laws. And while the BNPL application may look similar to a standard checkout with a credit card, protections that apply to credit cards may not apply to BNPL products. Many BNPL companies do not provide dispute resolution protections available to users of other forms of credit, like credit cards. And finally, depending on what rules the lender is following, different late fees and policies apply.

- o **Data harvesting:** BNPL lenders have access to the valuable payment histories of their customers. Some have used this collected data to create closed loop shopping apps with partner merchants, pushing specific brands and products, often geared toward younger audiences. As competitive forces pressure the merchant discount, lenders will need to find other sources of revenue to maintain growth and profitability. The Bureau would like to better understand practices around data collection, behavioral targeting, data monetization and the risks they may create for consumers.

The BNPL product has seen growth internationally and many other countries are also taking a close examination of its providers. As part of today's inquiry, the Bureau is working with its international partners in Australia, Sweden, Germany and the UK.

83.     On this news, Affirm's stock fell $11.74 per share, or 0.58%. to close at $99.24 per share on December 16, 2021.

84.     On January 12, 2022, the CFPB issued a press release updating investors and the general public on the status and position of the CFPB's investigation into Affirm and the four other BNPL businesses:

Several weeks ago, we issued a market-monitoring inquiry into "buy-now, pay later" (BNPL) products and business practices. Now we are inviting anyone interested in this market to submit comments—including families, small businesses, and international regulators.

Use of BNPL has seen astronomical growth. Companies like Affirm, Afterpay, Klarna, Paypal, and Zip (formerly Quadpay) have become almost ubiquitous in the retail market since the pandemic. This past holiday season, usage spiked even higher, especially among young people. Some analysts have suggested that BNPL has rerouted big holiday shopping money away from the credit card companies towards these companies, putting an enormous amount of consumer debt on their books.

People encounter BNPL credit at the point of sale either online or at traditional retail stores. The loans are presented as a type of deferred payment option that generally allows someone to split a purchase into smaller installment payments, often with a down payment of 25 percent. The application process is quick, involving relatively little information from the buyer, and the buyer usually pays no interest.

For the buyer, it may seem like they are getting something for nothing. And it can be appealing because not only is it convenient but instead of an upfront cost of $100, they pay $25. But we are concerned there may be systemic, underlying problems,

particularly around accumulating debt, regulatory arbitrage, and data harvesting in a consumer credit market already quickly changing with technology. For some people, BNPL could look like a standard payment method when they are really taking on a new form of debt.

While BNPL has caught the eye of many investors, including both big tech companies and significant venture capitalists, it has also caught the eye of fellow regulators around the world, including ones in Ireland, Germany, and the EU. Sweden already has a BNPL law that requires merchants to first present consumer options that do not contribute to debt. Last year, Her Majesty's Treasury in the United Kingdom signaled plans for greater regulation. And in late October, the Reserve Bank of Australia said that BNPL firms will no longer be able to bar merchants from passing on surcharges for their services.

In the U.S., Congress has tasked us with ensuring that markets for consumer financial products and services are fair, transparent, and competitive. To that end, it has authorized us to require participants in the marketplace to provide information that helps us monitor risks to consumers and to publish aggregated findings that are in the public interest. The orders issued on December 16 required five different buy now, pay later lenders to provide information on the risks and benefits of their products.

## AN INVESTOR FILES A SECURITIES CLASS ACTION

85.     On December 8, 2022, an alleged purchaser of Company stock filed a securities class action complaint, captioned *Kusnier v Affirm Holdings et al.*, Case No. 3:22-cv-07770-WHO in this District against Affirm and Defendants Levchin and Linford (the "the Securities Class Action"). The Securities Class Action alleges that throughout the class period of February 12, 2021 to December 15, 2021, Defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Securities Class Action alleges that defendants failed to disclose to investors that (i) Affirm's BNPL service facilitated excessive consumer debt, regulatory arbitrage, and data harvesting; (ii) the foregoing subjected Affirm to a heightened risk of regulatory scrutiny and enforcement action; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT
## DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO AFFIRM

86.     As a result of the Individual Defendants' improprieties, Affirm disseminated improper public statements concerning Affirm's operations, prospects, and internal controls. This misconduct has devastated Affirm's credibility.

87.     As a direct and proximate result of the Individual Defendants' actions, Affirm has expended, and will continue to expend, significant sums of money defending and paying any settlement or judgment in the Securities Class Action.

88.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Affirm's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

89.     Lastly, the actions of the Individual Defendants have irreparably damaged Affirm's corporate image and goodwill. For at least the foreseeable future, Affirm will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Affirm's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

90.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

91.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

92.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The

Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

93.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

94.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Affirm and was at all times acting within the course and scope of such agency.

**PLAINTIFF HAS BEEN A STOCKHOLDER AT ALL RELEVANT TIMES AND WILL FAIRLY AND ADEQUATELY REPRESENT THE COMPANY'S AND ITS SHAREHOLDERS' INTERESTS**

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

96.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

97.     Plaintiff is an owner of Affirm common stock and was an owner of Affirm common stock at all times relevant hereto.

98.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

**DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY**

99.     At the time Plaintiff commenced this action, the Board consisted of nine directors, including Director Defendants (Levchin, Liew, Michalek, Ming, Quarles, Rabois, Reses, and White)

and Relevant Non-Party Watson. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

100.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. They were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Affirm's business, operations, prospects, internal controls, and financial statements.

101.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

102.    The Director Defendants also ignored red flags of the Officer Defendants' false and misleading statements in the form of publicly available analyses. Such analyses asserted that the Company faced an increased risk of regulatory investigations due to accruing consumer debt, regulatory arbitrage, and data harvesting.

103.    The Director Defendants also approved the 2021 Proxy Statement and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

104.    The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, failure to take necessary and appropriate steps to ensure that the Board's duties were being

discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

105.    If the Director Defendants were to bring a suit on behalf of Affirm to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiffs' making a demand would be futile.

**THE AUDIT COMMITTEE DEFENDANTS FACE
A GREATER LIKELIHOOD OF PERSONAL LIABILITY**

106.    The Audit Committee Defendants (Ming, Quarles, and Rabois), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to the Audit Committee Defendants.

**FIRST CAUSE OF ACTION
Against the Individual Defendants for Breach of Fiduciary Duties**

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

108.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Affirm's business and affairs.

109.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

110.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants

intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Affirm.

111. In breach of their fiduciary duties owed and owe to Affirm, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, (i) the Company's BNPL business model raised massive consumer debt, regulatory arbitrage, and data harvesting; (ii) as a result, the Company faced an increased risk for regulatory inquiry, investigation, and enforcement; and (iii) the Company failed to maintain internal controls.; and (iv) that, as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

112. Accordingly, Affirm's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

113. The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby rendering themselves personally liable to the Company for breaching their fiduciary duties.

114. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

115. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

116.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

117.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

118.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Affirm has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Individual Defendants for**
**Violations of § 14(A) of the Exchange Act and SEC Rule 14a-9**

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

120.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

121.    The 2021 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited Affirm stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting

1  and/or failing to disclose the Company's shortcomings in connection with the Company's BNPL

2  business model raising massive consumer debt, regulatory arbitrage, and data harvesting.

3      122.    The Individual Defendants made untrue statements of material facts and omitted to

4  state material facts necessary to make the statements that were made not misleading in violation of

5  Section 14(a) and Rule 14a-9. By virtue of their positions within the Company and roles in the

6  process and in the preparation of the 2021 Proxy Statement, the Individual Defendants were aware

7  of this information and of their duty to disclose this information in the 2021 Proxy Statement

8      123.    The omissions and false and misleading statements in the 2021 Proxy Statement are

9  material in that a reasonable shareholder would consider them important in deciding how to vote on

10  the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure

11  as significantly altering the "total mix" of information made available in the 2021 Proxy Statement

12  and in other information reasonably available to stockholders.

13      124.    As a direct and proximate result of the dissemination of the false and misleading 2021

14  Proxy Statement that the Individual Defendants used to obtain stockholder approval of and thereby

15  re-elect directors, Nominal Defendant Affirm suffered damage and actual economic losses (i.e.,

16  wrongful re-election of directors) in an amount to be determined at trial.

17                      **THIRD CAUSE OF ACTION**
18              **Against the Individual Defendants for Unjust Enrichment**

19      125.    Plaintiff incorporates by reference and realleges each and every allegation set forth

20  above, as though fully set forth herein.

21      126.    By their wrongful acts, violations of law, and false and misleading statements and

22  omissions of material fact that they made or caused to be made, the Individual Defendants were

23  unjustly enriched at the expense of, and to the detriment of, Affirm.

24      127.    The Individual Defendants benefitted financially from the improper conduct,

25  received unjustly lucrative bonuses tied to the false and misleading statements, and received

26  bonuses, stock options, or similar compensation from Affirm that was tied to the performance or

27

28

artificially inflated valuation of Affirm, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

128.     Plaintiff, as a shareholder and representative of Affirm, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

129.     Plaintiff on behalf of Affirm has no adequate remedy at law.

### FOURTH CAUSE OF ACTION
### Against the Individual Defendants for Waste of Corporate Assets

130.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

132.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

133.     Plaintiff on behalf of Affirm has no adequate remedy at law.

### FIFTH CAUSE OF ACTION
### Against all the Individual Defendants for Aiding and Abetting

134.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135.     Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to Affirm and has participated in a conspiracy in breach of fiduciary duties.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

136.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

137.    The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its shareholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

138.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

139.    Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

140.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Affirm and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Awarding prejudgment interest to the Company;

D.     Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated:  May 24, 2023                                    Respectfully submitted,

                                                        **BRAGAR EAGEL & SQUIRE, P.C.**

                                                        */s/ Melissa A. Fortunato*
                                                        Melissa A. Fortunato (SBN 319767)
                                                          fortunato@bespc.com
                                                        445 S. Figueroa Street, Suite 3100
                                                        Los Angeles, CA 90071
                                                        Telephone: (213) 612-7735
                                                        Facsimile: (212) 214-0506

                                                        Marion Passmore (SBN 228474)
                                                          passmore@bespc.com
                                                        810 Seventh Avenue, Suite 620
                                                        New York, NY 10019
                                                        Telephone: (212) 308-5858
                                                        Facsimile: (212) 486-0462

                                                        Badge Humphries
                                                          humphries@bespc.com
                                                        2113 Middle Street, Suite 305
                                                        Sullivan's Island, SC 29482
                                                        Telephone: (843) 883-7444
                                                        Facsimile: (843) 883-7462

                                                        *Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Sabrina Jeffries, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 20, 2023

Sabrina C Jeffries (May 20, 2023 15:57 EDT)

Sabrina Jeffries